**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**ALPHONSO WILLIAMS,**

              Petitioner,                                          **5:01-CV-0551**
                                                                  **(RSP)**
        v.                                                        **5:96-CR-0022**
                                                                  **(Related criminal action)**

**UNITED STATES OF AMERICA,**

              Respondent.

::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::::
**APPEARANCES:**                                  OF COUNSEL

**FOR THE PETITIONER:**

**ALPHONSO WILLIAMS**
#07443-052
P.O. Box 2000
Lewisburg, PA 17837

**LAW OFFICE OF**                                **CLARENCE Q. JOHNSON, Esq.**
**CLARENCE Q. JOHNSON**
333 East Onondaga Street
Monroe Building, Fourth Floor
Syracuse, NY 13202

**FOR THE RESPONDENT:**

**OFFICE OF THE UNITED STATES**                  **BRENDA K. SANNES, Esq.**
**ATTORNEY**                                     **STEPHEN C. GREEN, Esq.**
P.O. Box 7198                                    Assistant U.S. Attorneys
100 South Clinton Street
Syracuse, NY 13261-7198

**ROSEMARY S. POOLER**
**CIRCUIT JUDGE[1]**

### MEMORANDUM-DECISION and ORDER

---

   [1] I have been designated to hold district court in the Northern District of New York as
required by the June 10, 1998 order of then-Chief Judge of the United States Court of
Appeals for the Second Circuit Ralph K. Winter.

## I.    Background

I presided over a jury trial in the United States District Court for the Northern District of New York (the "district court") beginning on January 27, 1997, which involved eleven defendants who were accused of conspiring to possess and possessing and selling cocaine and crack cocaine.  United States v. Comer, No. 5:96-CR-0022 (N.D.N.Y. 1997) ("Comer").[2] The evidence adduced at that trial demonstrated that Alfonso Williams ("Williams"), who was also known as Kareem (Trial Tr. Jan. 27, 1997 (hereinafter "Trial Tr."), 824-25), was a frequent customer of DeWayne Comer ("Comer"), a co-defendant at his trial, and that Williams purchased a minimum of 140 grams of crack cocaine from Comer during the period of time relevant to the charged conspiracy. See United States v. Giles, No. 97-1663-cr, 2000 WL 424142, at *9 (2d Cir. Apr. 13, 2000).[3] The prosecution further established that Williams sold some of the cocaine he bought from Comer to others. See, e.g., Trial Tr. 384-385 (testimony detailing a telephone call during which Williams informed Comer, in substance, that Williams wished to consult with his customer regarding the cocaine Williams was buying from Comer). Other evidence which suggested that Williams was involved in the criminal sale of cocaine included his ownership of a pager (and a cellular telephone)[4] despite the fact that he was

---

[2] All citations to the trial transcript refer to the record in Comer, unless otherwise noted. Subsequent record citations refer to the court documents and other material received into the record of Williams' post-conviction collateral challenge to his sentence and conviction, unless specifically noted otherwise. See ultra.

[3] Although that decision is unreported, I may nevertheless refer to the ruling in subsequent decisions relating to the same case. See 2d Cir. R. § 0.23, superseded on other grounds by Fed. R. Civ. P. 32.1.

[4] I note that the records from the cellular telephone service provider to which Williams subscribed at that time indicated that his cellular telephone was used for more than 2,200

unemployed. Furthermore, cooperating defendants testified that they also sold cocaine to Williams on various occasions. Trial Tr. 825-27, 2436-37.

Williams testified in his own defense at trial and admitted that he purchased drugs from Comer. Trial Tr. 4013. Williams claimed, however, that the drugs he purchased were solely for his personal use and that he never sold or distributed the drugs he purchased to others. Trial Tr. 4014.

On April 16, 1997, the jury returned guilty verdicts against nine of the defendants. The jury found Williams guilty of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1). Verdict Sheet, Apr. 21, 1997, 4.

At his sentencing hearing, I found both Williams' base offense and total offense levels to be thirty-four and his criminal history to be category one, yielding a range of imprisonment of 151 to 188 months under the United States Sentencing Guidelines. See Hr'g Tr., Oct. 27, 1997, 106-07. I thereafter sentenced Williams at the lowest end of that guideline range, viz to a term of imprisonment of 151 months. Id. at 107.

Williams filed an appeal of his conviction and sentence with the Second Circuit, however that court found the appeal to be without merit. See Giles, 2000 WL 424142, at *12. Thereafter, Williams filed a motion pursuant to 28 U.S.C. § 2255 in district court. See Mot. Vacate, Williams v. United States, No. 5:01-CV-0551 (N.D.N.Y. Apr. 16, 2001) ("Williams"). The court granted Williams' motion to file an amended motion to vacate or set aside his conviction, in an order entered on April 30, 2001; Williams then filed his amended pleading.

---

minutes during one thirty day period. Trial Tr. 188-89.

Am. Mot., May 25, 2001. The government submitted a response in opposition to that motion, along with a memorandum of law and supporting exhibits. Resp. Opp'n Mot., Mem., Affs., July 31, 2001. Williams thereafter filed a traverse and affidavits in further support of his amended motion. Traverse, Affs., Sep. 21, 2001.

After taking this motion under consideration, I issued a summary order in this action in which I denied seven of the eight grounds for relief asserted by Williams in his amended motion to vacate.  Summ. Order, Mar. 18, 2002, 2.  I later issued an order in which I explained in detail the legal basis for my decision to deny relief on those grounds. Mem. Decision & Order, April 23, 2003.

In that order, I also directed that an evidentiary hearing be conducted to resolve the issue raised by Williams' third ground for relief, wherein he argued that his trial attorney, Stephen Lance Cimino ("Cimino"), slept through critical portions of the related criminal trial.  See id. 8-9, 14; see also Am. Mot., Sep. 21, 2001, Statement of Claim ¶¶ 6, 46-48. Magistrate Judge Gustave J. DiBianco, to whom I referred the matter of appointing counsel on behalf of Williams for the scheduled hearing (Order, Mar. 28, 2002), subsequently appointed Clarence Q. Johnson ("Johnson") as counsel for Williams for the limited purpose of representing Williams during the evidentiary hearing. Order, Apr. 9, 2002.

At the beginning of the evidentiary hearing, which took place over the span of five hours, I briefly discussed the procedural posture of the case. I noted that in order to prevail on his ineffective assistance claim, Williams was required to establish that his trial counsel was ineffective under the standards for such a claim as delineated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). Tr. Evidentiary Hr'g, May 22, 2003 ("Tr. Evid.

4

Hr'g"), 5. I further opined that my ruling on Williams' claim would necessarily be guided by the decision in Tippins v. Walker, 77 F.3d 682 (2d Cir. 1996), the leading case in this Circuit addressing the circumstances under which a party may prevail in a habeas claim based upon an allegation that his attorney slept during portions of a criminal trial when the petitioner's interests were at stake. Tr. Evid. Hr'g, 6.

After the parties presented evidence in support of their respective positions at that hearing, I afforded Williams' counsel the opportunity to submit a supplemental brief in further support of the section of the amended motion to vacate that had addressed this issue. At that time, I specifically advised counsel that to prevail on his claim he must cite specific instances when his counsel slept during critical portions of that trial —thereby missing vital opportunities to defend his client against the charges against him. Tr. Evid. Hr'g, 133-35. After the hearing, Williams' counsel filed such a memorandum. Mem. Further Supp. Mot., Sep. 8, 2003. The government responded with its own memorandum, in which it argued that the remaining claim should be denied. Mem. Resp. Mot., Oct. 20, 2003.

## II.   Discussion

### A.   Governing Legal Standards

The Supreme Court has articulated a two-pronged test that federal courts are to utilize in determining whether a criminal defendant has not received the effective assistance of counsel. Strickland, 466 U.S. at 688-90, 694. For Williams to prevail on his ineffective assistance claim, he must establish both that the performance of his trial counsel fell below an objective standard of reasonableness and that he was prejudiced by the deficient acts or omissions of his counsel. Sapia v. United States, 433 F.3d 212, 218 (2d Cir. 2005); see also United States v. Levy, 377

5

F.3d 259, 264 (2d Cir. 2004); United States v. Champion, 234 F.3d 106, 109 (2d Cir. 2000). In

Strickland, however, the Court explicitly noted that there are limited situations where a

defendant need not affirmatively establish prejudice, because in certain contexts the "[a]ctual or

constructive denial of assistance of counsel altogether is legally presumed to result in

prejudice." 466 U.S. at 692.

As noted above, in Tippins the Second Circuit discussed the circumstances under which

a federal court may presume prejudice when a petitioner argues that his attorney had slept

during portions of his criminal trial. Specifically, that court noted that where a petitioner

establishes that his attorney "was unconscious for numerous extended periods of time during

which the defendant's interests were at stake," a federal district court may properly presume

that the petitioner was prejudiced by counsel's performance.[5] Tippins, 77 F.3d at 685; see also

United States v. Nuculovic, No. 04 Cr. 1110, 2006 WL 3591930, at *8 (S.D.N.Y. Dec. 12,

2006) (discussing circumstances under which prejudice may properly be presumed by district

court considering ineffective assistance claim, and citing, inter alia, Tippins, 77 F.3d at 687);

Muyet v. United States, No. 01 Civ. 9371, 2004 WL 1746369, at *3 (S.D.N.Y. Aug. 3, 2004)

(same).

**B.     Evidence Adduced at Williams' Evidentiary Hearing**

At the evidentiary hearing—over which I presided—the testimony of six individuals

squarely supported Williams' claim that his counsel slept during the course of the criminal trial.

---

[5] In Tippins, the court concluded that prejudice could be presumed in that case because
petitioner had established that his counsel slept every day of the trial, during the testimony of
a critical prosecution witness, and at a time when "damaging" testimony was being offered
by a co-defendant. 77 F.3d at 687.

I therefore will briefly review the substance of the testimony offered by these witnesses.

The first witness petitioner called at the evidentiary hearing was Naomi Hull, Williams' mother. Tr. Evid. Hr'g, 13. Naomi Hull testified that "[a]t various times" during the course of the trial, Cimino "appeared groggy," and was "bobbing his head." Tr. Evid. Hr'g, 16-17. She further testified that at some point during the trial she approached Cimino because she had been concerned about the fact that he was sleeping. She testified that Cimino assured her that he was "okay" and that he was merely suffering from sinus pain. Tr. Evid. Hr'g, 19-20.[6]

Naomi Hull's testimony was to some extent corroborated by a letter, received by the district court on October 20, 1997, which she had sent prior to Williams' sentencing. In that letter, to which Naomi Hull specifically referred at the evidentiary hearing (see Tr. Evid. Hr'g, 41-43), Naomi Hull advised the Court that she:

> ha[d] a problem with Alphonso's representation from the ... start. [She had] spoke[n] with Mr. Cimino in regards to his sleeping in the courtroom during the trial and he advised me that [t]his was due to the medication he was taking. We asked Mr. Cimino to remove himself if he didn't feel that he could put his best effort in representing Alfonso [Williams] and he assured us that he would.

Sentencing Letter, Oct. 20, 1997. At the evidentiary hearing, Naomi Hull specifically recalled that Cimino's head "dropped" as if asleep when a prosecution witness known as "Milk" was testifying.[7] Tr. Evid. Hr'g, 18. During cross-examination, she recounted that she had observed Cimino sleeping "on several occasions" while "several different witnesses" were testifying on behalf of the government. Tr. Evid. Hr'g, 36. When pressed for additional, specific instances of

---

[6] On cross-examination, Hull claimed that she spoke to Cimino "almost every day" about her concern that he was sleeping during the trial. Tr. Evid. Hr'g, 34.

[7] "Milk" is a nickname for Timothy E. Lewis. Trial Tr. 2166.

7

Cimino's conduct in this regard, Naomi Hull then claimed that Cimino appeared to have been sleeping during the testimony of Paul Hunter ("Hunter"), who at the time of the pertinent investigations was an agent with the Central New York Drug Enforcement Task Force. See Tr. Evid. Hr'g, 36-37; see also Trial Tr.1881. Additionally, she volunteered that Cimino did not appear to her to be "on his Ps and Qs" during the testimony of Agent Alvin Ricks ("Ricks") of the New York State Police. Tr. Evid. Hr'g, 37.

Angela Oliver, an acquaintance of Alonzo Stanley (who was Williams' co-defendant) testified at the evidentiary hearing that she had attended Williams' trial "a few days every week," for one to two hours each day. Tr. Evid. Hr'g, 48, 53. In support of Williams' claim regarding Cimino's alleged slumber during the course of the trial, Oliver testified that during the testimony of David McKinney, Jr. ("McKinney"),[8] Cimino's eyes were closed for a period of five to ten minutes. Tr. Evid. Hr'g, 50. Oliver also declared that while Ricks was testifying about Williams, she observed Cimino "nodding again" with his eyes closed for approximately five minutes. Tr. Evid. Hr'g, 51-52. Oliver stated that she believed that Cimino slept for between five to ten minutes on "several" of the days she attended the trial, Tr. Evid. Hr'g, 53, and specifically recalled Cimino being startled into consciousness on one occasion. Tr. Evid. Hr'g, 59. Oliver could not, however, specifically recall whether she had observed Cimino sleeping during testimony which related to the drug transactions that involved Williams. Tr. Evid. Hr'g, 60.

Arlene Joe ("Joe"), whose sons were Williams' co-defendants, attended the trial every day. Tr. Evid. Hr'g, 62-63. Joe testified that during the first week of trial, she observed Cimino

---

[8] "Debo" is a nickname for David McKinney, Jr., see Trial Tr. 784.

sleeping "at least" two or three times, for "at least five, ten minutes" each time. Tr. Evid. Hr'g, 65-66. She further claimed that Cimino "was sort of dozing off" throughout the course of the entire criminal trial. Tr. Evid. Hr'g, 67.

Joann Woods ("Woods"), whose son was another of Williams' co-defendants, attended that trial almost every day. Tr. Evid. Hr'g, 71. She testified that from the commencement of the trial, she observed Cimino "dozing off" two to three times per week for periods lasting between five to ten minutes. Tr. Evid. Hr'g, 72-73. However, Woods could not specifically recollect who was testifying while Cimino slept. Tr. Evid. Hr'g, 73-74.

Adrienne Williams, who is petitioner's sister (Tr. Evid. Hr'g, 76), testified that she attended the trial "mostly every day," and that she had frequently observed Cimino falling into a "deep sleep." Tr. Evid. Hr'g, 78. She specifically recalled that Cimino had slept "several" times during the testimony of prosecution witness Victor Isaac ("Isaac"), Tr. Evid. Hr'g, 78-79, however, on cross-examination she conceded that she could not recall any details of the testimony during which Cimino had allegedly slept —and in particular, whether it had related to drug transactions involving Williams. Tr. Evid. Hr'g, 83.

Frederick Hull, Jr., Williams' step-father (Tr. Evid. Hr'g, 85), testified that Cimino was "constantly sleeping," during most of the criminal trial, Tr. Evid. Hr'g, 86, 94, and he specifically alleged that Williams had told him that he had attempted to consult with Cimino during jury selection, but that he was unable to confer with Cimino, who was asleep. Tr. Evid. Hr'g, 88-89. He also testified that Cimino had been asleep at times when both Isaac and McKinney had been testifying for the Government. Tr. Evid. Hr'g, 90, 97. On cross-examination, Frederick Hull, Jr. stated that he had observed Cimino sleeping seven or eight

times during the trial, for periods of time lasting between five to ten minutes. Tr. Evid. Hr'g, 95.

Petitioner's counsel also called Cimino as a witness at the evidentiary hearing. Cimino testified that one day during jury selection, he experienced a sinus headache, and that he had placed his hands over his temples and squeezed his head in an attempt to alleviate the pain. Tr. Evid. Hr'g, 108-09.[9] Cimino also testified that on March 17, 1997, he went to the North Medical Center to seek treatment for an infection that had led to temporary hearing loss in his left ear. Tr. Evid. Hr'g, 114-15. Cimino did not recall Williams having voiced concern about the selection of the jury for his trial, Tr. Evid. Hr'g, and he specifically denied that he had ever slept during any portion of the trial. Tr. Evid. Hr'g, 126.

The government called court security officer James Cahill ("Cahill"). Cahill, whose job was to maintain security in the courtroom at Williams' trial, testified that his duties also included observing the defendants and their attorneys during the proceedings. Tr. Evid. Hr'g, 101-03. Cahill testified that Cimino was in his direct line of vision during the trial, and that he had never observed Cimino either sleeping or closing his eyes for five minutes (or more). Tr. Evid. Hr'g, 102-03. He further testified that if he had noticed that Cimino was sleeping, he would have brought that fact to my attention. Tr. Evid. Hr'g, 103.[10]

---

[9] Cimino stated that he had never placed his head on a table during this period of time, Tr. Evid. Hr'g, 109, although he did recall having engaged in a discussion with Naomi Hull during which he informed her that he was suffering from a sinus headache. Tr. Evid. Hr'g, 118-20.

[10] At the conclusion of Cimino's testimony, the Government noted that, in addition to the testimony adduced at the evidentiary hearing, it had also submitted affidavits in its opposition to Williams' amended motion to vacate, on which it would also rely. Tr. Evid. Hr'g, 130.

C.    **Analysis of Williams' Claim Regarding Cimino**

In considering Williams' claim of ineffective assistance of counsel at his trial, I carefully reviewed the trial testimony of the prosecution witnesses specifically mentioned by the individuals who testified on Williams' behalf at the evidentiary hearing.  During that review, I attempted to ascertain whether the trial transcript that detailed the testimony of those government witnesses confirmed Williams' claim that Cimino slept on numerous occasions during the trial. However, my review confirmed my personal recollection —that Cimino had not slept,[11] but rather that he had been vigilant and had defended Williams against the charges vigorously.

With respect to Ricks, I note that once he began offering testimony during his direct examination that tended to incriminate Williams, Cimino lodged numerous and specific objections. Trial Tr. 373, 375, 380-87, 427, 505, 544. Moreover, Cimino's cross-examination of Ricks was replete with references to that witness' earlier testimony. Trial Tr. 594-97, 602, 605, 609-11. That fact demonstrates that Cimino had a thorough command of Ricks' testimony on direct examination, and it casts significant doubt on the credibility of the testimony offered by both Naomi Hull and Oliver at the evidentiary hearing, as they had suggested that Cimino was not adequately representing Williams' interests while Ricks was testifying for the government.

While Cimino lodged relatively few objections during the government's direct examination of McKinney, the record of Cimino's cross and recross-examination of this witness establishes that Cimino referred—on numerous occasions— both to McKinney's

---

[11] Which I may properly consider when deciding this motion. <u>Polizzi v. United States</u>, 926 F.2d 1311 (2d Cir. 1990).

testimony on direct examination and to the testimony which that witness had provided while he was being cross-examined by the co-defendants' defense attorneys. See, e.g., Trial Tr. 1217, 1220, 1228, 1231-32, 1244-48, 1251-58, 1453-54. In the light of this evidence, the testimony of both Oliver and Frederick Hull, Jr. is unpersuasive.

Similarly, although Cimino did not lodge many objections during Hunter's direct examination, the record nevertheless establishes that Cimino was alert during that testimony. Cimino's entire cross-examination of Hunter related to testimony elicited from that witness on direct examination. Trial Tr. 1953-59. Moreover, while cross-examining that witness, Cimino even paraphrased the testimony Hunter had provided on direct examination, a fact that calls into question Frederick Hull, Jr.'s testimony that counsel had slept while Hunter was being examined. See Trial Tr. 1953-54, 1957-58.

Cimino also began his cross-examination of Lewis by referring to his direct testimony. Trial Tr. 2238. Cimino thereafter attempted to elicit testimony from that witness which would have corroborated Williams' principal defense to the charges, his claim that he had only purchased cocaine for personal use. Compare Trial Tr. 2242-46 with Trial Tr. 4013-14. The record therefore demonstrates that Cimino was vigorously representing his client's interests while Lewis was testifying.

Finally, although petitioner also proffered evidence that Cimino slept during the course of Isaac's testimony, Tr. Evid. Hr'g, 78-79, 90, 97, the record establishes that Cimino lodged more than twenty objections during the government's direct examination of that witness. See Trial Tr. 2378, 2385, 2388, 2392-95, 2404, 2408-09, 2415, 2436, 2438, 2440, 2442, 2452-53, 2456, 2475. Additionally, Cimino conducted a brief voir dire of this witness during the course

of his direct testimony.[12] Trial Tr. 2455-56. Furthermore, Cimino's cross-examination of Isaac was replete with specific references to that witness' testimony on direct examination. Trial Tr. 2706-11, 2717-18. Accordingly, I do not find the testimony of Adrienne Williams and Frederick Hull, Jr. about Cimino's alleged conduct while Isaac was testifying to be creditable.

Thus, the documentary evidence Williams presented in support of his claim that his attorney slept during the course of the underlying criminal trial, as well as the testimony adduced at the evidentiary hearing supporting that claim, is squarely contradicted by more creditable evidence. The claim is refuted not only by Cimino's testimony at the evidentiary hearing but, more, significantly, by the trial record itself. The trial transcript, which is an objective record of the proceeding, severely undercuts the testimony of the witnesses called by the petitioner at his evidentiary hearing.

Based upon the foregoing, I conclude that petitioner has not established that his attorney was unconscious for extended periods of time during the trial, or during periods in which Williams' interests were at stake. I therefore cannot "presume" that Williams was prejudiced by Cimino's actions for the purposes of petitioner's ineffectiveness claim. See, e.g., Tippins, 77 F.3d at 685.

I next consider whether Williams has established that his counsel slept at all during the course of his trial and, if so, whether petitioner was prejudiced by that conduct. See Tippins, 77 F.3d at 686 (holding that "episodes of inattention or slumber are perfectly amenable to analysis

---

[12] Although counsel requested permission to engage in a second voir dire during Isaac's testimony, I informed counsel that the matters he sought to elicit could be explored more properly during his cross-examination of that witness. Trial Tr. 2464-65.

under the Strickland prejudice test").[13]

The portions of the trial transcript I have cited above, the credible testimony offered by Cimino and Cahill at the evidentiary hearing, the affidavits filed by the government in opposition to Williams' motion, when taken together with my own personal observations of Cimino's conduct during the course of Williams' trial,[14] conclusively establish that Cimino did not sleep during the trial proceedings. Specifically, I find petitioner's sworn statement in which he claims that Cimino slept during the course of the criminal trial (Am. Mot. Statement of Claims ¶ 6), as well as the testimony of the witnesses who similarly claimed that counsel slept during that proceeding, to be neither persuasive nor creditable. As I noted above, the transcript of Williams' criminal trial, which comports squarely with my personal recollection of Cimino's performance at trial, plainly contradicts this claim.[15]

The contents of the affidavits provided by the government buttress this factual

---

[13] In this regard, the Second Circuit noted in Tippins that "[p]rolonged inattention during stretches of a long trial (by sleep, preoccupation or otherwise), particularly during periods concerned with other defendants, uncontested issues, or matters peripheral to a particular defendant, may be quantitatively substantial but without consequence. At such times, even alert and resourceful counsel cannot affect the proceedings to a client's advantage." 77 F.3d at 686.

[14] As noted above, it is appropriate for me to refer to my own personal observations regarding petitioner's claim. Polizzi, 926 F.2d at 1320-21; see also, e.g., United States v. Moreno, No. CR 93-156, 1996 WL 599718, at *1-2 (E.D.N.Y. Oct. 4, 1996) (finding petitioner's claim that his attorney slept throughout the course of his criminal trial untrue based, in part, upon the court's own recollection of the trial).

[15] I note that even assuming, arguendo, petitioner had established that Cimino had closed his eyes over the course of the lengthy criminal trial, it has been observed that "[a] person's closed eyes and relaxed body do not necessarily demonstrate sleep. Some people lower their lids to help concentration, although a perceptive judge can usually spot a snoozer." Guinyard v. Keane, 2002 WL 459923, at *1 (E.D.N.Y. Feb. 27, 2002), aff'd, 56 Fed.Appx. 44, (2d Cir. 2003).

determination. For example, James Medcraf, who represented a co-defendant at Williams' trial and was seated near Cimino during the course of that eleven week trial, testified in his affidavit that he never saw Cimino sleeping during the trial. Aff., July 26, 2001, ¶ 2. Moreover, my courtroom deputy, who was in a position to observe Cimino throughout that trial, testified in her affidavit that she never recalled seeing Cimino asleep during the course of the criminal trial. Aff. of Jackie Trytek, July 26, 2001, ¶ 3.

Finally, even had I found that Cimino had slept during some portion of the trial—which I have not—Williams would still need to establish that he was prejudiced by that conduct, i.e., that there is a some possibility that, but for the fact that Cimino slept, the outcome of Williams' trial would have been different. See Strickland, 466 U.S. at 694; Tippins, 77 F.3d at 686. Williams has made no showing that would tend to establish this element of his ineffectiveness claim. Specifically, he has not demonstrated that his counsel did not lodge appropriate objections, effectively cross-examine prosecution witnesses, pursue a sound defense strategy or otherwise fail to zealously represent Williams' interests during the course of the trial. Since there is no evidence upon which I may properly conclude that the outcome of petitioner's criminal trial could have been different, but for the claimed unreasonable conduct of Cimino, I must deny petitioner's amended motion to vacate.

In sum, I have carefully considered Williams' claim that his trial attorney slept during his trial. However, my review of the documents filed in this action, the testimony presented at the May 22, 2003 evidentiary hearing, and the relevant portions of the transcript demonstrates

that Williams has not proven this fact by a preponderance of the evidence.[16] Since petitioner has

not established that his trial attorney engaged in objectively unreasonable conduct during the

course of the related criminal proceeding, or that he was prejudiced by his attorney's conduct, I

deny Williams' amended motion to vacate.

## III.   Certificate of Appealability

28 U.S.C. § 2253(c)(1) provides in relevant part that:

> Unless a circuit justice or judge issues a certificate of
> appealability, an appeal may not be taken to the court of appeals
> from –
>
> > (B) the final order in a proceeding under section
> > 2255.

A certificate of appealability may only be issued "if the applicant has made a substantial

showing of the denial of a constitutional right." See 28 U.S.C. § 2253(c)(2); see also United

States v. Outen, 286 F.3d 622, 641 (2d Cir. 2002).

Since Williams has failed to make such a showing herein, the court declines to issue any

certificate of appealability in this matter.

**WHEREFORE**, based upon my review of the submissions of the parties, the transcripts

of the proceedings referenced above, the applicable law, and for the reasons I have stated herein

and in my April 24, 2003 Memorandum-Decision and Order, I hereby

**ORDER**, that the Third Ground in Williams' Amended Motion to Vacate is denied, and

I further

**ORDER**, that Williams' Amended Motion to Vacate therefore be **DENIED** and

---

[16] The movant bears the burden of proof in a collateral challenge brought pursuant to 28
U.S.C. § 2255.  Williams v. United States, 481 F.2d 339, 346 (2d Cir. 1973).

**DISMISSED** in its entirety, and I further

ORDER, that the Clerk of the Court for the Northern District of New York serve a copy

of this Memorandum-Decision and Order upon the parties by regular or electronic mail.

Dated:          August        *15*       , 2007
                Syracuse, NY

                                    _Rosemary S. Pooler_
                                    Rosemary S. Pooler
                                    U.S. Circuit Judge

17